**Pages 1 - 36**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE EDWARD M. CHEN, JUDGE

| | |
|---|---|
| SLACK TECHNOLOGIES, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| VS. ) | **No. C 20-1509 EMC** |
| ) | |
| PHOJI, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | San Francisco, California |
| | Thursday, August 6, 2020 |

**TRANSCRIPT OF VIDEOCONFERENCE PROCEEDINGS**

**APPEARANCES**:   (via Zoom Video Conferencing)

For Plaintiff:          DESMARAIS LLP
                        101 California Street
                        San Francisco, California 94111
                   **BY:  AMEET A. MODI, ESQ.**
                        **EMILY H. CHEN, ESQ.**

For Defendant:          DEWITT LLP
                        Two East Mifflin Street, Suite 600
                        Madison, Wisconsin 53703
                   **BY:  ELIJAH B. VAN CAMP, ESQ.**

Reported By:     Katherine Powell Sullivan, CSR #5812, CRR, RMR
                 Official Reporter - U.S. District Court

**Thursday - August 6, 2020**                                    **1:29 p.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:**  Court is now in session.  The Honorable Edward M. Chen is presiding.  Calling civil action 20-1509, Slack Technologies, Inc., versus Phoji, Inc.

Counsel, please state your appearances for the record beginning with plaintiff's counsel.

**MR. MODI:**  Good afternoon, Your Honor.  Ameet Modi, from the law firm of Desmarais LLP, representing the plaintiff Slack.  On the line from my office is Emily Chen.  And also from Slack is Cindy Wheeler, who is the senior director of IP at Slack.

**THE COURT:**  All right.  Thank you, Mr. Modi.

**MR. VAN CAMP:**  Good afternoon, Your Honor.  Eli Van Camp appearing on behalf of the defendant Phoji, Inc.  One of my colleagues from my law firm, DeWitt LLP, Edward Chadwick, may also be attending through the public function.

**THE COURT:**  All right.  Great.  Thank you.  And welcome.

There is no dispute, I take it, that the -- as far as choice of law goes, over the question of personal jurisdiction, that this court is to apply Federal Circuit law; correct?

**MR. VAN CAMP:**  Correct.

**THE COURT:**  Okay.  And my understanding of the Federal

Circuit law, not unlike most Circuits, but there are some nuances here that may be material, is that we look at three things. Does the defendant purposely direct activities or has it purposely directed activities at foreign residents; whether a claim arises out of those or relates to those activities; and, finally, if so, whether the assertion of jurisdiction is reasonable and fair.

It's pretty clear that where there is a fairly specific threat of litigation -- and I understand that the purpose of this was to try to induce the plaintiff into entering a license, but, you know, as we've looked at all those cases involving the question of Article III jurisdiction and what constitutes sufficient threat to confer jurisdiction for Article III purposes, this is the kind of case where you would find that because there are numerous letters, numerous correspondence, thinly veiled and sort of nonveiled threat of litigation as the obvious alternative if the license is not entered into and negotiations fail, claim chart, et cetera, et cetera.

So it seems to me that those cases that find that a sort of specific and concrete threat of litigation, particularly where there's a series of letters, emails, telephone calls, et cetera, et cetera, is enough to satisfy that first factor. And, clearly, this claim arises out of that. So there's no -- no real doubt about that.

From what I see, the real question is the third factor, whether assertion of jurisdiction here would be fair and reasonable.

And this is where I'm trying to understand the Federal Circuit law.  It seems to suggest, when you look at the cases, that what the courts look to -- absent enough activity to constitute sort of general jurisdiction, you know, such as systematic and continuous business, that you're almost a resident, that's not what we're talking about here -- that the contact alone is generally not enough with the one plaintiff, you know, declaratory relief plaintiff or the substantive defendant.

But you look at the other activities, in addition to the threat of infringement, and it seems like the cases that find sufficient activities are ones where it's not just general business activity but activity that is related to the patent, either enforcement of the patent or some other aspect of -- of the patent that's at issue here that -- that is required.

The activity can't be just general commercial activity, for instance.  And *Jack Henry* is a case where -- I guess, one of the most recent cases -- where the Circuit found it was reasonable, wasn't a burden on the defendant.

And there wasn't a lot of analysis, but, you know, the fact remains in that case, as I understand it, there was a multiplicity of lawsuits that were brought by the patent

holder.

And, similarly, in some more recent cases, you know, there's -- there's activity that is related to the patent that, you know, constituted -- I mean, in *Jack Henry* there are -- it involved 11 plaintiff banks that all had been subject to a cease and desist order.  In the *Xilinx* case, there was previous litigation of seven patent infringement suits in the forum state.

And here I don't see other accuseds.  I don't know if there's -- I don't see any record of any activity brought or threats brought against other potential putative infringers here in California.  Now, unless I missed something in the record.  But that seems to be the issue.  Is there enough?

I understand, you know, the involvement with Apple and Google and the trip out here and some of the other commercial activities, but they don't seem to be connected with enforcement of the patent.  And that's where -- that's where the issue seems to be.

**MR. MODI:**  Your Honor, this is Ameet Modi for Slack. Perhaps I can, with Your Honor's permission, address that first.

**THE COURT:**  Yes.

**MR. MODI:**  Two responses to Your Honor's comments.  I think, as Your Honor noted, clearly, there was a, you know, clear assertion of this patent against Slack, and the claim

arises from it.  So the minimum context prongs are satisfied.

What distinguishes this case from some of the others I think Your Honor might have in mind is that there is no question that there are a number of activities that Phoji has conducted in the state of California that are -- at least according to Phoji, are specific to this patent.  Right?

There's not, for example, a dispute, at least from Phoji's perspective, like there was in *Petzila*, over whether certain activities that were conducted in the forum actually had a tie to the patent.

I believe *Petzila* was Your Honor's case where, you know, the activity that was being conducted in the forum had to do with treat packs, and the issue was that the patent-in-suit had nothing to do with treat packs.  It was a dispenser.

By contrast, here there's -- Phoji itself concedes that it has engaged in a number of activities in California using California businesses.  And all of those activities directly relate to an application that Phoji contends is practiced by the patent.

So there is a tie -- you know, this is a patent case.  Slack's claim relates to the '149 patent.  And all of Phoji's activities in California that are alleged in the complaint are, according to Phoji, directly related to the '149 patent.

**THE COURT:**  It's related to -- really, it's commercialization of the patent, but not any alleged

infringement of the patent.

**MR. MODI:**  Your Honor, I actually think it depends on what those activities are.  First of all, you know, Phoji has contended that all of its activities are so-called commercial activities.

Of course, it also contended that its interactions with Slack were commercialization activities, which, I think, as Your Honor noted, is -- is not a fair characterization.

But a number of -- the facts that Slack has alleged in its complaint have also, I think, demonstrated that Phoji has attempted to engage others to -- at least to take an implied license to its products which it contends is covered by its patent, right.

The ability to use a product at the behest of the patent holder is effectively an implied license.  So --

**THE COURT:**  Does that apply to Apple and Google? They're just a distributor.  Right?  They're just an outlet. They're not using -- they're not --

**MR. MODI:**  We have alleged in the complaint, on information and belief, that Apple and Google are permitted to distribute Phoji's app; in other words, to provide it to the public.

I think Phoji argues that that's not a sale under the Patent Act.  That's not my understanding of -- you know, a sale doesn't have to constitute an exchange of money.

And to the extent that Phoji, under its agreement with Apple, for example, has provided Apple with the right to distribute to the public what it calls a patented app, then it has implicitly licensed Apple to that right.

**THE COURT:**  If this puts some premium on -- sort of allow that if there is an appointment of an exclusive distributorship like in *Genetic Implant*, I mean, then you have an ongoing relationship.  You know, you sort of assume that there's going to be -- when you have an exclusive distributorship, that there are things you have to monitor. There's ongoing relationship.

It's just, a nonexclusive license, the nature of that relationship is not as sustained.  And so there's some distinction there, is there not, between the exclusive and nonexclusive distributorships?

**MR. MODI:**  I agree that there's some distinction between exclusive and nonexclusive, but, Your Honor, I would argue that I don't think the Federal Circuit has made that a requirement for personal jurisdiction under the due process factor, that there be some exclusive relationship or that there be some sort of ongoing obligation.

In fact, Your Honor, we cited the *Xilinx* case.  I think that's instructive here.  *Xilinx v. Papst*.  This is 848 F.3d 1346.  This is a 2017 case from the Federal Circuit.  And at page 1355, it explains that the inquiry under the

reasonableness prong, which is the due process factor, is not limited to the specific facts giving rise to or relating to the particular litigation.  And then it quotes *Burger King*, which is the Supreme Court case.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum state, these contacts may be considered, in light of other factors, to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.

So my point and the *Xilinx* court's point being, Your Honor, we're at the -- considering due process now, is it fair, given that Phoji has purposefully directed activities at California, and Slack's claim arises from those, now the question is, is it fair, given the totality of the other circumstances and facts that Slack has alleged, that Phoji be called into court here in California.

And I would submit that the numerous contacts that Slack has alleged in its complaint more than satisfy that reasonableness prong, particularly given, as the Supreme Court has said, it is Phoji's burden to demonstrate a compelling case, compelling case that being called into this court would, you know, offend the traditional notions of fair play and substantial justice.  And they simply cannot do that.

Phoji has traveled --

**THE COURT:**  The burden is on Phoji to show that it is unreasonable; right?

**MR. MODI:**  That is correct.

**THE COURT:**  At this point.

**MR. MODI:**  That is correct.

**THE COURT:**  And the test, as articulated in *Jack Henry*, is that it's got to be unduly burdensome.

**MR. MODI:**  I believe that is the phrase used.

**THE COURT:**  I mean, that's the general focus.  At least that's sort of what *Jack Henry* focuses on.

And I guess your argument would be, well, all right, even if it's not an exclusive license, even if there's not -- I guess you would admit there's no evidence of any enforcement action per se.  There are no other parallel actions like this, that you know of.

**MR. MODI:**  We don't know of any other parallel actions.  I suppose the minute Phoji sends one additional letter, like it did to Slack, you know, that would -- you know, I would submit that shouldn't change the analysis.

But, Your Honor, to answer your question, we're not aware of any other threats like they've threatened Slack.

**THE COURT:**  So your point is, given the extensiveness of the contact of -- I guess, you know, first up would be Apple and Google.  Is that -- is that the primary demonstration of lack of -- let me ask you, the -- was there a forum selection

clause in the Apple contract?

MR. MODI:  Your Honor, we don't have the Apple contract.  We alleged on information and belief that -- and, in fact, Phoji concedes in its CEO's declaration that there is a license agreement between Apple and Phoji.

We don't have a copy of it.  And it was a little surprising that Phoji didn't attach a copy of it, but, nevertheless, it is our understanding that there is -- there are certain rights that -- there are certain provisions to which Phoji has agreed.

One of them being, to Your Honor's point, subjecting itself to personal jurisdiction in the Northern District of California for any disputes arising out of that agreement. Yes, Your Honor.

THE COURT:  You've not seen it, but you have reason to believe that there's a personal jurisdiction waiver provision.

MR. MODI:  Yes, Your Honor.  And let me clarify that here.  I believe Apple makes available on its website, sort of, the form agreement.  And based on that form agreement, we understand, you know, there is this forum selection clause.

The specific agreement that Phoji and Apple entered into, we believe, is that agreement, and that's what we've alleged as a factual matter.  And we have not -- I don't believe Phoji has contradicted that in any way.

THE COURT:  And what about with Google?

**MR. MODI:**  It was our understanding, Your Honor, that Google, similarly, has a form agreement that a developer like Phoji would enter into.

I understand from Phoji's papers that they deny having entered into any agreement with Google, and so I suppose on that issue there is a factual dispute.

I would submit that, on the pleadings, factual disputes, of course, are resolved -- on a motion to dismiss are resolved in favor of the -- excuse me -- in favor of the nonmovant.

**THE COURT:**  All right.  Mr. Van Camp, I'd like you to respond.  And, in particular, how are we supposed to evaluate these other activities?

Do they have to be -- are they limited -- to be cognizable, do they have to be limited to either enforcement activities against potential infringers or an exclusive distributorship or licensing as opposed to a nonexclusive?

And what about just general other activities?

**MR. VAN CAMP:**  Sorry.  Didn't mean to interrupt.

**THE COURT:**  Yeah.  Go ahead.

**MR. VAN CAMP:**  Thank you, Your Honor.

So, yeah, there are a number of things to address.

With regard to exclusive distributors, I think what we see in the case law is that whether there is an exclusive distributor within the forum at issue is a relevant factor that the Court can take into account.  It's not dispositive, by any

means, but it's certainly a relevant factor that can be taken into account.

What I think we don't see is the relevance of nonexclusive distributors.  I haven't seen that in the case law.  The focus in the cases is on exclusive distributors.  And as far as I'm aware, Slack is not even alleging that there's any sort of exclusive distributor at issue.

And I want to step back for a moment to address the Apple and the Google allegations because there's been a discussion up to this point sort of assuming that Apple or Google are distributors.  And we don't think that's accurate.

Slack has not identified any evidence to suggest that Apple and Google are distributors of anything related to Phoji's patent.  They're essentially just platforms that the app is listed on.

The way that I've thought about it is consistent with, you know, if a company uses Squarespace to host their website and they put their products on their website, Squarespace isn't the distributor of its products or anything related to that website.  It's simply that platform for that company to use.  And so we disagree with the idea that Apple or Google are distributors.

And as we pointed out in our brief, if -- if simply listing an app on the Apple App Store or the Google Play Store were sufficient on its own to confer personal jurisdiction,

which is what Slack seems to suggest, we would certainly see cases to that effect because thousands of companies would essentially automatically be subject to personal jurisdiction in California.  And we don't see that in any cases.

And Slack has not been able to point to any cases to that effect, and so we disagree with the premise that Apple and Google are distributors.  And beyond that, regardless of their -- their role, they're certainly not exclusive distributors.  Even the fact that both of them are involved, we've got both Apple and Google, they can't be exclusive distributors of anything.

And I do want to turn to one point that counsel mentioned regarding a dispute of fact.  And this is something we see -- and we don't necessarily need to get into this, but with regard to the request for jurisdictional discovery, there is no dispute of fact as to any agreement that Phoji entered into with Google.

The CEO of Phoji has attested that he has no knowledge of any agreement with Google.  And Slack has not presented any evidence contrary.  And so Slack speculating that maybe there was an agreement is not a disputed fact.  That's just speculation.

**THE COURT:**  The relationship, though, I mean, they do business.

**MR. VAN CAMP:**  Well, I'm not sure that I would agree

that I would qualify it as doing business.

Again, in the situation where we're talking about using a website as a platform, I don't think it's accurate to say that a company is in business with Squarespace in the same way that, you know, the thousands and thousands of companies that list or use apps through the Apple Store are in business with Apple.

It's a platform that they use. They have to sign a contract in order to use that App Store in the same way that I'm sure I have signed contracts with Apple related to my Apple products. That doesn't mean that I'm in business with Apple any more than it means that Phoji is in business with Apple.

THE COURT: But what Google does is similar to what Apple does. It provides a platform.

MR. VAN CAMP: Right.

THE COURT: Is it sold through Google store? Is that how you -- is that the --

MR. VAN CAMP: The Google Play Store, the app --

THE COURT: Yeah.

MR. VAN CAMP: -- right, is listed through the Google Play Store. That's right.

THE COURT: Normally, I assume, they have to get listed there. You have to agree to something, click something, right, when you sign on? I'm sure you -- these days you may not know what you're signing, but you've got to click something before you get on there.

And not everybody -- I assume there's some vetting process, you know, to get on Apple Store or Google Play?  I mean, not anybody can just put up anything; right?  In other words, this is not Craigslist.

**MR. VAN CAMP:**  I think that's probably right.  I don't know all the details of what exactly you have to click, but I do know, as we've indicated in our briefing, that -- you know, we concede that there is an agreement with Apple.  We haven't been able to locate any agreement with Google.  And Slack hasn't produced anything like that.

But, in any event, let's assume there is an agreement with Google.  In terms of our motion to dismiss, it's our position that it's immaterial because, one, they're not distributors; and, two, they're certainly not exclusive distributors related in any way to the patent at issue in the case.

And, again, the cases certainly find relevance to exclusive distributors, but that's not what either Apple or Google are.

**THE COURT:**  Is it possible to satisfy this third component without enforcement actions to an exclusive distributorship or license but just on the basis of a whole lot of business?

Because, at the end of the day, one could argue, as was said in *Jack Henry*, you look at burden on the defendant.  And is it unduly burdensome to require litigation in this district?

And if -- if the patent holder engages in a ton of commercial activity, is there a logical reason why one would say, well, that's not enough, it's got to be related to this patent, it's got to be either enforcement of this patent or exclusive license of this patent?

So what, they make a billion dollars out of the state.  So what that they come into the state often to do deals and transactions and negotiate.  That doesn't matter.  You've got to look at specific enforcement actions relative to this patent at issue or the exclusive licensing of that patent, otherwise everything else doesn't count.

Is that -- is that a fair statement of the law?  Is that your view of the law?

**MR. VAN CAMP:**  Well, I think the -- a plaintiff can certainly look to the general commercial activities of a defendant within the general jurisdiction inquiry.  That's where all this comes in.

**THE COURT:**  Right.  For specific jurisdiction purposes.  In general, we know that that is very hard to --

**MR. VAN CAMP:**  Right.

**THE COURT:**  I'm just talking about specific -- purposefully directed prong of specific jurisdiction.  And under the unfairness third prong, can -- that's my question -- can unfairness be based on other commercial activities that are not related to enforcement of the patent-at-issue?

Let's say it's another patent, maybe even one that's in the same field.  There's a lot of activity on that patent and three other patents that are, you know, complementary technology or something, but not this patent.  Can that be a basis, or no?

MR. VAN CAMP:  Well, Your Honor, do you mind if I just step back a moment to address something you -- we've had some discussion about where the other activities fits into the jurisdictional analysis.

THE COURT:  Yeah.

MR. VAN CAMP:  And, you know, I -- I apologize if I'm wrong about this, but my understanding is that the other activities analysis fits into the same minimum contacts analysis.  And the minimum contacts is something that the plaintiff -- it's plaintiff's burden to prove.

And so it's my understanding that the other activities analysis is still within the minimum activities inquiry.

Now --

THE COURT:  All right.  Whoever's got the burden of proof.  I'm trying to get a legal -- trying to find out what the parameters of your legal argument are.

MR. VAN CAMP:  Right.  Right.  Well, and I think my understanding of the case law is that it does need to be related to enforcement activities related to the patent.

You know, I think there was discussion in the briefing

about the -- the *Genetic Veterinary Sciences* case.  And I think we don't fully know the impact of that.  And based on that case, it seems to be theoretically possible that you could have communications on their own without other activities that are constituted of enforcement activities toward the patent that would somehow qualify.  But I don't think we've seen practical examples of that in the cases.

You know, for instance, the *Xilinx* case which counsel cited I also agree is a good example, because the *Xilinx* case focused on the fact that not only were there cease and desist -- there was a cease and desist letter, but the Court really focused on the importance of the physical visit of the person related to enforcement.

And it wasn't just a visit to California to conduct other business or a visit to California for a vacation.  It was a visit to California specifically -- specifically related to patent enforcement activities related to that patent.

So my reading of the case law, based on -- you know, including *Jack Henry* and *Xilinx* and *Petzila* and *Addison* and *Red Wing*, is that you -- that the -- that cease and desist letters or licensing letters on their own are generally not going to be sufficient and you need those other activities.

And those other activities have to be specific activities.  They have to be enforcement activities related to the patent.  And that's why it's important, I think, to focus on the facts

that Slack is actually alleging related to those other activities.

So we talked about Apple and Google. And, like I said, I think if that was sufficient to confer jurisdiction, we would see that in some case. And we don't see that conferring personal jurisdiction in a situation like this, at least in any case we've been able to find. And Slack clearly hasn't been able to find it either.

So what are the other activities that they're talking about? They're talking about a visit by the CEO of Phoji to California for a marketing seminar back in 2017, two years before there were any communications between the plaintiff and the defendant in this case.

It wasn't related to the patent, it wasn't related to enforcement, and clearly nothing in this lawsuit was arising out of something that happened at a marketing conference two years before the parties in this lawsuit ever communicated with each other.

You know, they have -- they point to, I think, a video interview that happened where my client wasn't in California, but a single video interview with someone affiliated with a California company. Again, not related to enforcement of this patent, but related to general commercialization activities.

And so whether it's theoretically possible to have such extensive commercialization activities that they can support

specific jurisdiction, that's not the way I read the cases.

But, in any event, even if that were possible, the activities that are identified by Slack in this case are -- are so minuscule and tangential that even if that were theoretically possible, it certainly would not be possible in this case.

**THE COURT:**  Can you comment on the 2020 business trip to, quote, exercise the monopoly granted by the '149, is the way it's phrased.

**MR. VAN CAMP:**  Right.  Well, the easiest answer is that trip never occurred.  And that's -- that's uncontradicted by Slack.

In their briefing, they speculate that, essentially, maybe Phoji's CEO is lying about that, that the trip was cancelled and it never happened.  But they don't actually contradict it with any evidence.  So there's not any dispute about the fact that that trip never occurred.

So a trip that never occurred, and he never went to California for that trip, can't serve to support specific jurisdiction.

**THE COURT:**  Well, all right.  So let me ask you a question which you have studiously avoided, and that is trying to explore the limits, the lawful limits of your argument.

If there was a portfolio of patents that were related and complementary, but this suit only involved the '149, let's call

it the '150, the '151 were related, and there was a ton of activity to enforce the '150 in California; lawsuits, cease and desist orders, et cetera, et cetera, but for this one only one series of correspondence, are you suggesting that because it didn't involve this patent at issue, that all the other enforcement activities, all the other contacts with the state of California and alleged patent infringers would not be even considered in the other activity prong of the third prong of specific jurisdiction analysis?

MR. VAN CAMP:  Well, keep in mind, Your Honor, this is -- this is me hypothesizing because I -- for what I'm about to say --

THE COURT:  I'm hypothesizing.  I'm asking you.  I'm trying to learn the limits, because a lot of time that's how you discern what the proper doctrine is.  You test it.  I'm testing.

MR. VAN CAMP:  Well, I would be hypothesizing just based on my own guessing, not based on any case law that I'm aware of.  So, I mean, I want to say that theoretically it's possible, but I'm not aware of case law that has come down that way, so I can't say yes, I think that's supported by the law.

I mean, for instance, in *Jack Henry* -- and Your Honor may know if I'm wrong about this, but I think the litigation threats, the communications that were made to the 11 other banks, at least, I think, were all made related to the same

patent.

**THE COURT:** Yeah.

**MR. VAN CAMP:** You know, if that were not the case, if the Court were taking that into account and they were all related to different patents or related patents, then I would say, yes, I think that's possible.

And so I certainly don't want to avoid Your Honor's question. I just haven't seen case law that -- that would support that approach.

**THE COURT:** Well, you know, one could logically say that you look at everything, look at the, quote, variety of circumstances. I think those are the words of the Federal Circuit, "variety of interests."

**MR. VAN CAMP:** Uh-huh.

**THE COURT:** And things that would be given most weight would be enforcement activity of this patent. That's kind of front and center. Exclusive dealerships, distributorships, licenses for this patent, because it's kind of like a way of enforcing would be, you know, in that hierarchy.

But the further you get away from enforcement and activities relative to this patent and just more generalized commercial activities, my guess is that you can consider that, but you've got to have a whole lot more of that other stuff; right?

At the end -- because it all goes to what's an

unreasonable burden on the defendant.  And the more related stuff in the state, the more likely one could anticipate they're going to have to do some litigation in the state, the less likely it is related, then, you know, perhaps you require a greater quantum of, kind of, general activity.  At least that's one way, you know, one could look at it and kind of conciliate the cases.

But on that front, I guess your argument is that their biggest commercial activity is putting the stuff on Apple Store and -- I mean, on Apple and Google Play, and that's -- that's pretty tenuous; right?

Because there's no -- whether you call it a distributorship, whether you call it just a platform, we know what it is.  I mean, there's not -- it's not like a typical licensing agreement.

It's like going to the flea market, you know.  It is a step above Craigslist.  You can't just put it on without any monitoring.  On the other hand, it's not like a Ford distributorship, you know, or a Sony distributorship.

And I guess, Mr. Modi, I'd like to see what your response is.  Mr. Van Camp was saying, well, if you do that, if you say anytime you put something in Google Store -- or Apple Store or Google Play, you're it.  That's enough activity because Google happens to be located here, Apple is located here.

That seems like a rather -- I mean, it's almost

coincidental where Apple is headquartered, right, in a commercial sense.  It really doesn't make -- if they decide to headquarter in Tucson, why would that make any difference commercially?  It kind of even doesn't matter where they are.

MR. MODI:  Here's -- Your Honor, here's the distinguishing fact that I think Phoji is alighting over.  The application at issue here, Phoji says, is covered by this patent.

This patent that it has accused Slack repeatedly of infringing and that Slack would like a determination that it is not infringing, this same patent Phoji says is covered by this application, it has affirmatively entered into an agreement with Apple to distribute it through the state of California.

And that is the -- you know, so it's not the case and I'm not arguing that any developer that puts an option on Apple's App Store is necessarily subject to jurisdiction.  But in this patent case, where a developer uses a California company to distribute what it calls a patented application, it is more than fair and reasonable to ask that company to come to this court and defend allegations or defend itself in a lawsuit of noninfringement regarding that same patent.  And that -- that's what due process -- that's all that due process asks.

THE COURT:  What is the relationship between the -- whether you call it sale, distribution, putting up for sale of a patented application -- and this is Phoji's own product;

right?

**MR. MODI:**  Correct.

**THE COURT:**  -- and -- and the enforcement claim here?

**MR. MODI:**  Well, first and foremost, the relationship is that it's the same patent.  It's the same patent rights that are allegedly covering the product that is being distributed and that Phoji is attempting to enforce against Slack.

That -- you know, that is the relationship that exists in this case that does not exist in some of the other cases where --

**THE COURT:**  Well, except Phoji could bring this patent infringement suit whether or not it had put up its application, whether they decided not to sell, whether they decided only to sell through some other small website.  Well, let's say on Craigslist.

Why does that make any difference to this suit?  Is there a causal -- is there some kind of doctrinal significance and causal legal relationship between what they're doing with the application?  I mean, are you not asserting an estoppel claim?

Is there a legal nexus between its putting up the application, which I understand practices the patent, in Apple Store and the alleged infringement alleged in this suit here, or at least assuming there's a -- a counterclaim?

**MR. MODI:**  Not necessarily, Your Honor, but I don't think that's the relevant question for personal jurisdiction

under -- and particularly whether due process permits personal jurisdiction over Phoji in this case.

I think, as Your Honor suggested earlier, you know, once minimum contacts have been satisfied and, as the *Xilinx* case makes clear, at that point you look at fairness considerations and the totality of the circumstances to determine whether it would be fair to bring Phoji into this court.

**THE COURT:**  Well, that fairness argument would be strengthened if there's some legal nexus between its activity in this state -- I mean, that's not necessarily required, because if it -- if it brought a series of other infringement suits.  Again, that could be brought independently.  That's not necessarily tied against other alleged infringers.  I guess that's not necessarily legally tied other than the fact that you're going to have some overlap, perhaps, in claim construction or something like that.

**MR. MODI:**  Right.  Well, Your Honor, to answer that question, here's one potential legal nexus, and it's not one that Slack necessarily endorses or believes is the correct view.  But in this action, you know, it is certainly possible that Phoji may allege that it would be entitled to damages in the form of lost profits or to, you know, prevail on infringement.

Again, that's not something Slack agrees with or that would be warranted, but Phoji's own distribution or -- through

the state of its product has a legal nexus insofar as it may contend that that is relevant to the issue of any damages in this case.

**THE COURT:** It may inform the damages analysis somehow, like it provides a basis or if there's a fall off in sales or something like that?

**MR. MODI:** That's correct, Your Honor.

**THE COURT:** Do we have any idea of the volume of sales of the Phoji product on Apple and Google?

**MR. VAN CAMP:** Well, my -- my understanding, Your Honor, is I know that our -- that Phoji does not have any revenue from California. And so I'm not -- I'm not sure if they have any sales, but I know that they don't have any revenue from California.

**THE COURT:** From either Google or Apple?

**MR. VAN CAMP:** Well, I'm not sure that they get paid from Google or Apple.

**THE COURT:** From their being on the platform, they've not generated any sales?

**MR. VAN CAMP:** I don't know the answer to that, Your Honor. What I'm confident about is -- and, again, just because this is what was prepared for this motion and what we were inquired about -- is that they don't generate revenue and have not generated revenue in California.

**THE COURT:** That means they haven't made any sales in

California one way or another, whether it's direct or through an intermediary platform?

MR. VAN CAMP:  I'm not certain of the answer of whether they have sold any iterations of the app through the Google Play Store or the Apple App Store.

But if there are -- if there are people who are -- I'm not confident of the answer to that, Your Honor.

THE COURT:  But -- but whatever they've sold, none of it has come from California?  None of it's sold from California?  There's no revenue from California?

MR. VAN CAMP:  That's my understanding, yes.

THE COURT:  That would imply that they didn't sell anything anywhere, including Google -- through Google or Apple in California.

MR. VAN CAMP:  I think it's someone -- so I'm in Wisconsin.  And if I am purchasing an app through the Apple App Store, you know, from some company, say it's through Apple -- well, say it's through a company that's in Minnesota.  I don't know if that revenue is coming from Wisconsin or if it's coming from California.

THE COURT:  Well --

MR. VAN CAMP:  Your Honor, may I just address one or two things that Mr. Modi stated?

THE COURT:  Yeah.

MR. VAN CAMP:  Just -- I just want to be clear, and I

know we're talking a lot about the Apple and Google situation, but this relates to the relationship between Phoji and Apple or Google.

And as we indicated in our briefing, this isn't the typical situation where Phoji would be licensing its patent and granting exclusive rights to utilize that patent to Apple.  In fact, it's exactly the opposite, where Phoji was licensing Apple's software.

Apple was not licensing the app.  Apple was not licensing the patent from Phoji.  And so it's the opposite of the current situation where the -- the courts consider.  So it's yet another reason why that doesn't fit into the typical analysis.

And I do want to point out that, I think, Your Honor, the inquiries Your Honor were making were very relevant about the connection of the Apple App Store and the Google Play Store, because there is such emphasis on that by Slack, because there's such a lack of other activities related to enforcement that it is important that nothing from this litigation arises from the use of the Apple App Store and the Google Play Store. I do think that that's significant.

And I don't think that Slack addresses -- they certainly don't address that in any meaningful way in their briefing about why this litigation arises from that.

**THE COURT:**  Well, what about the fact that -- is it contested that there are no revenues from California from --

from the Phoji app sale?  Is there any contrary evidence of that?

**MR. MODI:**  Your Honor, at this point Slack doesn't have any discovery from Phoji to know one way or the other on that question.

**THE COURT:**  I mean, if this weren't a patent case, if this were in any other garden variety, you know, tort-type or consumer product case looking at personal jurisdiction, the amount of revenue -- you know, we often look at, you know, people said, well, they sold X amount of dollars of stuff in California, sounds like a lot.  Then sometimes you look at, well, what percentage of total revenue?  Did the majority of income or a disproportionate amount come from this particular forum state?  You know, we look at these things.

The fact that there's no revenue from California, I mean, that -- that suggests -- seems like that would be a relevant factor.  There's a difference if a whole lot of revenue came from the state.

Almost to your early point that you were sort of reluctant to get into, Mr. Modi, about how damages might play into it, it doesn't sound like there's going to be much damages evidence coming out of California.  You've got Apple but not out of California.

**MR. MODI:**  Your Honor, there may well not be.  One thing to note is in -- I believe this is the last of Phoji's

threatening letters to Slack.  This is document 29-4 on the docket.

Phoji writes to Slack that it and its IP counsel are fully confident that Phoji can demonstrate Slack's past and ongoing infringement of the '149 patent caused it substantial damages.

THE COURT:  Yeah, well --

MR. MODI:  So, you know, I don't know what that's based on or if that was based on nothing.

I understand Mr. Van Camp's representations here today. Again, though, I think, setting aside what, in fact, it has sold to date, the relevant question here is, given all of its, you know, assertion activity against Slack and its activities specific to the '149 patent in the state of California, the only question is whether it would be fair to bring Phoji into this case.  And I think that the due process law makes clear that it is more than fair to do so.

THE COURT:  All right.  Well, this has been very interesting.  I will take the matter under submission.

I think there are -- there are some gray areas here in terms of just what is the base of analysis, what is to be considered relevant.  And I do want to take a second look at the -- at the case law and -- and the record here.

Let me just ask -- and, therefore, I'm not going to set further dates in this case because that's all contingent on whether this case stays here or not.

But I am interested -- you have set October 30th for a settlement conference.  I guess that is some ways off, isn't it?

Is there any interest in -- in trying to do any kind of ADR on a fairly expedited basis, if there's a way to get, for instance, a magistrate judge to -- to hear you all?

Is there interest in early talks?

MR. MODI:  Your Honor, may I respond to that?

THE COURT:  Yeah.

MR. MODI:  I think one thing that is sort of interesting, as we were putting together the statement for the conference was, Slack doesn't have any indication, and Phoji hasn't said one way or the other, whether Phoji intends to counterclaim for infringement.

And I think that is going to be a very pertinent factor in the usefulness of any ADR.  And it is certainly strange, from Slack's perspective, given the communications pre-suit.

If -- if Phoji has no such intention, you know, from Slack's perspective, Phoji could simply grant a covenant not to sue and we could take this entire dispute off Your Honor's plate and certainly off Slack's docket.

And so I mention that simply because, in response to Your Honor's question about the usefulness of ADR at an early stage, I think having that kind of indication from Phoji would certainly be helpful.

THE COURT:  Any comments, Mr. Van Camp, in that regard?

MR. VAN CAMP:  Well, Your Honor, I mean, we haven't -- Phoji hasn't done a suit of counterclaim for infringement because we haven't gotten to that point in the pleadings.

As indicated in the joint case management statement, we certainly intend to conduct discovery on an infringement because as in, you know, I think most declaratory judgment patent actions, it won't be any surprise to Slack that almost certainly we're going to be asserting that infringement claim.

THE COURT:  Well, that then begs the question, if that is coming, and you're indicating that it is coming, is there any interest in a -- in an early, early ADR process?

MR. MODI:  Your Honor, speaking for Slack, I -- I'd want to confer with my client on that.

I think, certainly, having Your Honor's ruling on the personal jurisdiction issue will, of course, be something that Slack would likely want, you know, in order for ADR to be productive.  But I --

THE COURT:  No, I can always suspend things pretty darn quickly.  I'm willing to hold it.  But that's why I asked, quickly --

MR. MODI:  Right.

THE COURT:  -- whether -- just as they are now, I don't know how much you know of each other's case at this

point, but I just raise it because, if there is, you know, we could try to accommodate this.  If not, this takes the usual course.

**MR. VAN CAMP:**  Your Honor, from Phoji's perspective, again, obviously, I'd have to talk to our client, but we certainly would be open to discussing that.

Related to timing and how quickly things are moving forward, Mr. Modi and I had previously discussed and agreed on a discovery accommodation, given the pending motion to dismiss.

And at least from Phoji's perspective, we thought that it made sense to hold off on getting into full-fledged discovery given the pending motion to dismiss.

And, I guess, related to that, I would make a request that we continue to hold off on discovery so that both of the parties aren't wasting resources unnecessarily.

**THE COURT:**  Do you agree, Mr. Modi?

**MR. MODI:**  I think, conceptually, I would agree to that.  Perhaps Mr. Van Camp and I could sort of confer offline on that, but I think conceptually that seems correct.

**THE COURT:**  All right.  I will take the matter under submission.

If by some chance you all are interested in a -- sort of an immediate sort of ADR that -- using court resources, let me know.  We'll see if we can accommodate you.  Otherwise, I will take the matter under submission and rule, hopefully, shortly.

**MR. MODI:**  Thank you, Your Honor.

**THE COURT:**  If the case -- if the motion is denied, we'll then schedule a further settlement conference and then set those dates, because I do appreciate the scheduling.  And I usually schedule out through claim construction first.

I don't usually set a trial quite yet, until we get through claim construction, but I have your proposed spacings and we can work on that.  Okay?

**MR. MODI:**  Thank you, Your Honor.

**MR. VAN CAMP:**  Thank you, Your Honor.

**THE COURT:**  Thank you.  Appreciate it.

(At 2:20 p.m. the proceedings were adjourned.)

- - - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Tuesday, August 18, 2020

*Katherine Sullivan*

_____

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter